Y. Christopher Nagakawa (SBN 207433)
**ZIMMERMAN REED LLP**
6420 Wilshire Blvd, Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780; Fax: (877) 500-8781
Christopher.nagakawa@zimmreed.com

Ryan J. Ellersick (*Pro Hac Vice forthcoming*)
**ZIMMERMAN REED LLP**
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Tel: (480) 348-6400; Fax: (480) 348-6415
ryan.ellersick@zimmreed.com

Jason P. Johnston (*Pro Hac Vice forthcoming*)
**ZIMMERMAN REED LLP**
80 S 8th Street, 1100 IDS Center
Minneapolis, MN 55402
Tel: (612) 341-0400; Fax: (612) 341-0844
Jason.johnston@zimmreed.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Rafael Valdez Jr., Stefanie Diamond, Michael Belushi Lewis, individually, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Emanate Health,<br><br>Defendant. | CASE NO.: 2:23-CV-07828<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. Violation of California Invasion of Privacy Act (Cal. Penal Code § 630 *et seq.*)<br>2. Violation of Electronic Communications Privacy Act (18 U.S.C. § 2511(1), et seq.)<br>3. Violation of Confidentiality of Medical Information Act (Cal. Civ. Code §§ 56, *et seq.*)<br>4. Invasion of Privacy<br>5. Invasion of Privacy, Cal. Constitution<br>6. Violation of Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)<br>7. Breach of Implied Contract<br>8. Unjust Enrichment<br><br>(Jury Trial Demanded) |

Plaintiffs Rafael Valdez Jr., Stefanie Diamond, and Michael Belushi Lewis ("Plaintiffs"), on behalf of themselves and all others similarly situated, file this Class Action Complaint against Defendant Emanate Health ("Defendant" or "Emanate"), and in support state the following:

## INTRODUCTION

1.     This case is about Emanate's secret and unauthorized disclosure of its patients' sensitive health information to third parties through various online tracking technologies.  Emanate serves more than one million people in the San Gabriel Valley through three major hospitals, a home-care program, and a network of more than 16 primary and specialty care locations.  Emanate also operates a website, www.emanatehealth.org, (the "Website"), where it allows existing and prospective patients to search for doctors, research conditions and symptoms, and search for locations within the Emanate network that provide specific services, such as "behavioral health," and "maternity."

2.     Unbeknownst to its patients and prospective patients visiting the Website, Emanate procures third-party technology companies to secretly intercept and record the visitors' activities on the Website in real-time, including specific searches for sensitive health-related topics.  Emanate does this for its own profit and gain—to drive visits to its website using more sophisticated and targeted advertising based on data harvested from its website visitors.  But these profits come at the cost of patients' privacy.  This case seeks to end Emanate's exploitation of its patients' sensitive health data and make those patients whole under federal and state privacy laws.

3.     Plaintiffs bring this class action complaint on behalf of a class of persons impacted by Defendant's secret and unauthorized disclosure of their highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Sensitive Information") to third parties.

4.     Defendant solicited and obtained Plaintiffs' and the Class's Sensitive Information in connection with its services as a healthcare provider. In operating the

Website as part of its healthcare activities, Defendant promised its patients that their Sensitive Information was private and secure and would never be disclosed for "marketing purposes" absent written authorization.[1] Despite these representations and promises, Defendant allowed third parties to secretly intercept and record its patients' Sensitive Information for "marketing purposes" through various online tracking technologies.

5.     For example, Defendant incorporates Meta Platform, Inc.'s ("Meta") tracking technology, the Meta Pixel ("Pixel"), on the Website.  Pixel is a snippet of code that, when embedded on a third-party website, tracks the website visitor's activity on that website and sends that data to Meta.  Pixel tracks mouse clicks, words typed into search bars, and pages visited on the website, all of which in many cases include sensitive personal and identifying information that is not anonymized.  Indeed, Pixel is routinely used to target specific customers by utilizing the data gathered to build profiles for the purpose of future targeting and marketing.  Here, the information transmitted to third-party Meta, without Plaintiffs' consent, included private healthcare information, which is some of the most personal and sensitive data Plaintiffs possess.

6.     As another example of online tracking technologies, Defendant embeds snippets of JavaScript computer code ("Session Replay Code") on the Website, which then deploys on each website visitor's internet browser for the purpose of intercepting and recording the website visitor's electronic communications with Defendant's Website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time.  On information and belief, Defendant procured third parties—including but not limited to Crazy Egg, Inc.—to conduct these tracking and monitoring activities without disclosure to Plaintiffs and the Class.

7.     Defendant also uses tracking technology on its website to track the

---

[1]     https://www.emanatehealth.org/notice-of-privacy-practices/

CLASS ACTION COMPLAINT

webpages visited by every user in order to link that web activity with potential subsequent phone calls to the Defendant placed by the user.  On information and belief, Defendant procured third parties—including but not limited to CallRail Inc.—to conduct these tracking and monitoring activities without disclosure to Plaintiffs and the Class.

8.    Defendant's use of Pixel, Session Replay Code, and other online tracking technologies (collectively, "tracking technologies"), allowed for a broad scope of patient information, including highly confidential medical information related to specific symptoms and treatments, to be collected and transmitted to third parties without patients' knowledge or consent.

9.    In July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of Sensitive Information to third parties.[2]  The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."[3] According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[4]

10.    In December 2022, the U.S. Department of Health and Human Services Office for Civil Rights ("OCR") warned healthcare providers that, "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations

---

[2]    https://www.ftc.gov/business-guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information

[3]    https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[4]    *Id.*

of the HIPAA Rules."[5]  The OCR's guidance also made clear that, "disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."

11.    Despite these warnings from federal regulators and the clear terms of Defendant's own Privacy Policy, Emanate has and continues to deploy tracking technologies that result in unauthorized disclosures of its patients' Sensitive Information. Defendant uses these tracking technologies to maliciously collect data from its patients in a manner that allows Defendant to subvert federally required consent.  On information and belief, Defendant later uses the data collected from the tracking technologies to improve and save costs on its marketing campaigns. Defendant also uses these technologies to improve its data analytics and increase revenue by, among other things, attracting new patients. Once Defendant has the data, however, it may use it for other things, including selling it.

12.    As a result of Defendant's use of tracking technologies on the Website, Plaintiffs' and the Class's Sensitive Information—including unique identifiers; information about patients' health care providers; types of treatments or conditions researched; patient status; and other sensitive health-related information submitted by Plaintiffs and the Class Members on Defendant's Website—was compromised and disclosed to third parties without authorization or consent.

13.    Such private information allowed third parties to know that a specific patient was seeking confidential medical care or being treated for a specific condition.

14.    Plaintiffs and the Class Members never consented to, authorized, or otherwise agreed to allow Defendant to disclose their Sensitive Information to anyone other than those reasonably believed to be part of Emanate and acting in some healthcare capacity.  Despite this, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' Sensitive Information to unauthorized third parties.

---

[5]    https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

CLASS ACTION COMPLAINT

15.    As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class Members' Sensitive Information, Plaintiffs and the Class Members have suffered injury and harm, including invasions of privacy; loss of the benefit of the bargain Plaintiffs and the Class Members considered at the time they bargained for medical services and agreed to use Defendant's Website; statutory damages; and the continued and ongoing substantial risk of their Sensitive Information being exposed to third parties.

16.    Plaintiffs and the Class Members bring this action to recover for the harm they suffered, and assert the following claims: violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq.*; violations of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. §§ 2511); violations of the Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code §§ 56, *et seq.*; Invasion of Privacy-Intrusion upon Seclusion; violations of the right to privacy under the California Constitution; violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; Breach of Implied Contract; and Unjust Enrichment.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the Complaint asserts claims pursuant to Defendant's violations of ECPA, 18 U.S.C. § 2511.  The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

18.    This Court has personal jurisdiction over this action because Plaintiffs are residents and citizens of the State of California who received health care from Defendant including via Defendant's Website while in the State of California.  Defendant is a California nonprofit corporation with its principal office located at 140 West College Street, Covina, CA 91723.

19.    Venue is proper in this Court because Defendant's headquarters is located within the District, and Plaintiffs' claims arise from Defendant's conduct in this District.

# PARTIES

20.    **Plaintiff** Rafael Valdez, Jr., is a natural person domiciled in the State of California.  At all relevant times, he resided in California.  For the last several years, and most recently in August 2023, he visited the Defendant's Website while in California to conduct searches related to his symptoms/conditions, possible treatments, doctors, and medical records. He also used the patient portal on the Defendant's Website to review medical records, including test results and messages from doctors. Using the patient portal, attempting to login into the patient portal, or interacting with the patient portal in other ways, all identified Plaintiff Valdez as a patient or potential patient of Emanate.[6] At all relevant times, Plaintiff Valdez had a Facebook account and generally stayed logged-in to his account.  Thus, through Pixel, Plaintiff Valdez's information related to searches on the Website, his medical records, and his patient status were all transmitted to Meta without his authorization or consent.

21.    **Plaintiff** Stefanie Diamond is a natural person domiciled in the State of California.  At all relevant times, she resided in Covina, CA.  Over approximately the last year, she visited the Defendant's Website while in California to search for her test results, symptoms/conditions, possible treatments, doctors, and billing information. She also used the patient portal on the Defendant's Website to review test results. Using the patient portal, attempting to login into the patient portal, or interacting with the patient portal in other ways, all identified Plaintiff Diamond as a patient or potential patient of Emanate. Plaintiff Diamond had a Facebook account from approximately 2007 to 2017. At all relevant times, Plaintiff Diamond had an Instagram[7] account and generally stayed logged-in to her account. Thus, through Pixel, Plaintiff Diamond's information related to

---

[6]    Further details regarding any Plaintiffs' medical conditions and prospective or actual medical treatments entered or searched on Defendant's website are not required to be pled under Fed. R. Civ. P. 8, and doing so would require Plaintiffs to publicly disclose private and sensitive medical data, compounding the violation of their medical privacy.

[7]    Facebook acquired Instagram in 2012. *Facebook Buys Instagram for $1 Billion,* https://archive.nytimes.com/dealbook.nytimes.com/2012/04/09/facebook-buys-instagram-for-1-billion/

CLASS ACTION COMPLAINT

searches on the Website, her medical records, and her patient status were all transmitted to Meta without her authorization or consent.

22. **Plaintiff** Michael Belushi Lewis is a natural person domiciled in the State of California. At all relevant times, he resided in Covina, CA. Over approximately the last two years, and most recently in August 2023, he visited the Defendant's Website while in California to search for his doctors, symptoms/conditions, possible treatments, and insurance information. He also used the patient portal on the Defendant's Website. Using the patient portal, attempting to login into the patient portal, or interacting with the patient portal in other ways, all identified Plaintiff Lewis as a patient or potential patient of Emanate. At all relevant times, Plaintiff Lewis had a Facebook account and generally stayed logged-in to his account. Thus, through Pixel, Plaintiff Lewis' information related to searches on the Website, his medical records, and his patient status were all transmitted to Meta without his authorization or consent.

23. Plaintiffs reasonably expected that their online communications with Defendant were between them and Defendant, would remain private, and would not be shared with third parties without their consent.

24. After using Defendant's Website, it is Plaintiffs' recollection that they received some targeted advertisements from Emanate and/or other healthcare providers.

25. **Defendant** is a California nonprofit corporation with its principal place of business in Covina, California. Defendant operates three major hospitals, a home-care program, and a network of more than 16 primary and specialty care locations, all in the State of California.[8] Defendant employs more than 1,000 physicians and 3,500 staff. Defendant's specialty care services include Behavioral Health, Cancer Care, Cardiovascular Care, Emergency Care, Neuroscience and Stroke Care, Orthopedics Care,

---

[8] https://www.emanatehealth.org/about-us/

Sports Medicine, and Women's Health.[9]  Defendant's registered agent is Rajesh K. Sharma, located at 210 West San Bernardino Road, Covina, California 91723.

## FACTUAL BACKGROUND

### A.    Defendant Collected, Maintained, and Stored Sensitive Information

26.    To obtain healthcare services, patients and prospective patients, like Plaintiffs and the Class, must provide Defendant with highly sensitive information, including PII, PHI, or both.  Defendant compiles, stores, and maintains the highly sensitive PII and PHI and, often, through the provision of its services, creates records containing additionally highly sensitive data concerning patients' medical diagnostics, treatment, and other personal information documented by medical providers. Defendant serves a population of approximately one million residents, meaning it has created and maintains a massive repository of Sensitive Information.

27.    Defendant tells patients it will keep their Sensitive Information secure and private.  Indeed, Defendant maintains a Privacy Policy on the Website that states, "We are required by law to maintain the privacy and security of your protected health information."[10]  The Privacy Policy also provides, "We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[11] Defendant assures its patients that it "will not use or share your information other than as described [in the Privacy Policy] unless you tell us we can in writing."[12]

28.    Importantly, Defendant also promises its patients and prospective patients who visit its Website: "In these cases we never share your information unless you give us written permission: Marketing purposes."[13]

---

[9]    https://www.emanatehealth.org/news/releases/citrus-valley-health-partners-officially-becomes-emanate-health/

[10]    https://www.emanatehealth.org/notice-of-privacy-practices/

[11]    *Id.*

[12]    *Id.*

[13]    *Id.*

CLASS ACTION COMPLAINT

29.    Plaintiffs and the Class had a reasonable expectation of privacy and relied on Defendant to protect their Sensitive Information.  Defendant knew or should have known that failing to adequately protect patient information could cause substantial harm. Moreover, through its Privacy Policy, Defendant acknowledged its obligation to reasonably safeguard Sensitive Information against unauthorized disclosure to third parties.

30.    As described throughout this Complaint, Defendant did not reasonably protect, secure, or store Plaintiffs' and the Class's Sensitive Information, but rather knowingly and intentionally granted third-party technology companies access to that information in violation of federal and state law, as well as its stated practices and agreements with Plaintiffs and the Class.

31.    As a direct and proximate result of Defendant's actions, third parties obtained access to and collected confidential patient data without the patients' authorization, resulting in a significant invasion of patient privacy and breach of sensitive data.

**B.    Defendant Exposed Its Patients' Sensitive Information**

32.    Defendant implements several tracking technologies on its Website for the purpose of intercepting, recording, and transmiting its patients' and prospective patients' Sensitive Information to third parties to increase Defendant's own profits.  The tracking technologies Defendant uses include but are not limited to: the Meta Pixel; Session Replay Code from a company called Crazy Egg, Inc. and potentially other providers; and visitor webpage tracking by a company called CallRail and potentially other providers.

33.    Defendant could have configured its Website not to communicate or share any information with third parties, or to limit the information it communicated to third parties while maintaining the necessary security and confidentiality of Sensitive Information, but it intentionally did not.

34.    Defendant intercepted and disclosed the following Sensitive Information of its patients and prospective patients through the use of the tracking technologies: (1)

Plaintiffs' and the Class Members' status as medical patients, or alternatively, Plaintiffs' and the Class Members' consideration of becoming a medical patient of Defendant; (2) Plaintiffs' and the Class Members' communications with Defendant on the Website; (3) Plaintiffs' and the Class Members' searches for treatment locations, specific medical providers, and particular medical conditions and treatments; (4) PII, including but not limited to patients' locations, IP address, device identifier, cookies used to identify specific users, and/or individuals' unique Facebook user number ("FID").  In short, Defendant intercepted and procured Meta to intercept Plaintiffs' and the Class Members' activity on the Website and personal identifying information to link specific users to their activity on the Website.  The Sensitive Information disclosed by Defendant constituted actual content that revealed patients' medical conditions/symptoms, treatments, specific search queries, searches for particular doctors, and other Sensitive Information.

35. Despite the highly sensitive nature of the information Defendant obtained, created, and stored, Defendant inexplicably failed to take appropriate steps to protect the privacy of the PII and PHI of Plaintiffs and the Class, and instead intentionally employed the tracking technologies to willingly disclose patient data to third parties.

36. Defendant deprived Plaintiffs and the Class Members of their privacy rights when it: (a) implemented the tracking technologies that surreptitiously tracked, recorded, and disclosed Plaintiffs' and the Class Members' confidential communications and private information; (b) disclosed Plaintiffs' and the Class Members' protected information to unauthorized third-parties; and (c) failed to provide notice to Plaintiffs and the Class Members or obtain their consent to share their Sensitive Information with others.

## C. The Meta Pixel

37. Meta's, f/k/a Facebook, core business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram.  The bulk of Meta's billions of dollars in annual revenue comes from advertising—a practice in which Meta actively participates through the use of algorithms that connect ads to specific users.

38.     Over the last decade, Meta has become one of the largest and fastest growing online advertisers in the world.  Since its creation in 2004, Meta's daily, monthly, and annual user base has grown exponentially to billions of users.

39.     Meta's advertising business has been successful due, in significant part, to Meta's ability to target consumers, both based on information users provide to Meta and other information about users Meta extracts from the internet at large.  Given the highly specific data used to target particular users, thousands of companies and individuals utilize Meta's advertising services.

40.     One of Meta's most powerful advertising tools is the Meta Pixel (formerly the Facebook Pixel), which it first launched in 2015.

41.     Meta branded Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."  Meta further stated:

> Facebook pixel, [is] a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website.  We're also announcing the availability of custom conversions, a new rule-based method to track and report conversions for your Facebook ads.
>
> Facebook pixel makes things simple for advertisers by combining the functionality of the Conversion Tracking pixels and Custom Audience pixels into a single pixel.  You only need to place a single pixel across your entire website to report and optimize for conversions.  Since it is built on top of the upgraded Custom Audience pixel, all the features announced in our previous blog post (Announcing Upgrades to Conversion Tracking and Optimization at Facebook) are supported through Facebook pixel as well.
>
> [Advertisers and website operators] can use Facebook pixel to track and optimize for conversions by adding standard events (e.g., Purchase) to your Facebook pixel base code on appropriate pages (e.g. purchase confirmation page).[14]

42.     Pixel is a publicly available piece of code that Meta makes available to web developers for free.  Website developers can choose to install and use Pixel on their websites to track and measure certain actions by website visitors.  When a website visitor

---

[14]     Cecile Ho, Announcing Facebook Pixel, Meta (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

CLASS ACTION COMPLAINT

takes an action a developer chooses to track on their website, the Pixel is triggered and sends data about that "Event" to Meta. All of this happens without the user's knowledge or consent.

43. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

44. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

45. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

    a. HTTP Request: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL (for instance, uploading a PDF for filing a motion to a court).

    b. Cookies: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

    c. HTTP Response: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP

Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

46.    An individual's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as the "Doctors" page). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the individual's screen as they navigate Defendant's Website.

47.    Every website is composed of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

48.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant embedded Pixel in its source code for that very purpose.

49.    By secretly recording and transmitting data to Meta—without the user's knowledge or consent—Pixel acts much like a traditional wiretap controlled by Defendant. When individuals visit Emanate's Website via an HTTP Request to Defendant's server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user along with the invisible Source Code that includes the Pixel. At that point, Defendant, in essence, hands individuals visiting its Website a tapped device. Once the webpage is loaded into the individual's browser, Pixel quietly waits for private user communications on the webpage to trigger the code-based wiretap. Pixel then intercepts those communications intended only for Defendant and transmits the communications to Meta.

50.     The data intercepted by Pixel is also linked to a specific IP address,[15] which Meta may use in combination with other cookies and tracking technologies to associate the web activity to a specific Facebook user.[16]

51.     Meta does this by placing cookies in the web browsers of users logged into their services. The "c_user" cookie, for example, contains a numerical value known as the Facebook ID, which uniquely identifies a Facebook user.  When a Facebook user visits the Defendant's Website while logged-in to their Facebook account, Pixel transmits the user's private web communications with the Defendant along with the "c_user" cookie.  Meta can then use this information to match the web communications with the user's Facebook ID.

52.     Even if a user does not have a Facebook account or is not logged-in to Facebook when browsing the Defendant's Website, Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie.  Meta can then use that unique identifier, along with other persistent cookies, to link the user's web communications with the user's Facebook ID.  And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via the Pixel and "_fbp" cookie to the newly created account.

53.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to Meta.  Meta then uses the information transmitted by Pixel to match the user with their Facebook ID.

---

[15]     https://developers.facebook.com/docs/meta-pixel

[16]     *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (July 16, 2022) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites ("The Meta Pixel sends information to Facebook via scripts running in a person's internet browser, so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.").

CLASS ACTION COMPLAINT

54.     Judge William H. Orrick on the U.S. District Court for the Northern District of California recently summarized how this process plays out:

> To understand how the Meta Pixel typically works, imagine the following scenario. A shoe company wishes to gather certain information on customers and potential customers who visit its website. The shoe company first agrees to Meta's Business Tools Terms (discussed below), which govern the use of data from the Pixel. The shoe company then customizes the Meta Pixel to track, say, every time a site visitor clicks on the "sale" button on its website, which is called an "Event." Every time a user accesses the website and clicks on the "sale" button (i.e., an "Event" occurs), it triggers the Meta Pixel, which then sends certain data to Meta. Meta will attempt to match the customer data that it receives to Meta users—Meta cannot match non-Meta users. The shoe company may then choose to create "Custom Audiences" (i.e., all of the customers and potential customers who clicked on the "sale" button) who will receive targeted ads on Facebook, Instagram, and publishers within Meta's Audience Network. Meta may also provide the shoe company with de-identified, aggregated information so the shoe company understands the impact of its ads by measuring what happens when people see them. Meta does not reveal the identity of the matched Meta users to the shoe company.

*In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *2 (N.D. Cal. Dec. 22, 2022) (internal citations omitted).[17]

55.     It is one thing for a retail business to use Pixel to track web activity in the regular course of commercial activity.  But in this case, Defendant, a healthcare provider, employed Pixel to intercept, duplicate, and re-direct Plaintiffs' and Class Members' sensitive health information to Meta.

56.     The following is an example of how Pixel works on Defendant's Website. When an individual visits https://www.emanatehealth.org/ and navigates to the "Services" page, the user can select a wide variety of services related to sensitive medical conditions, including "Behavioral Health" or "Women's health."  Clicking on the "Women's health" option takes the user to the following webpage:

---

[17]     In describing Pixel technology in *In re Meta Pixel Healthcare Litig.*, the court referenced the declaration of expert Richard M. Smith, which provides further details on the manner in which the challenged Pixel technology works and Meta's arrangements with health providers that employ it. 2022 WL 17869218, at *2.  *See* Declaration of Richard M. Smith, filed in *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO (N.D. Cal.) [ECF 49].

CLASS ACTION COMPLAINT



57.    Because Defendant's Website has the Pixel embedded, the user's activity visiting the "Women's health" webpage is intercepted and transmitted to Facebook along with (1) the "c_user" cookie that identifies the user based on their unique Facebook ID, and/or (2) the unique identifier associated with the "_fbp" cookie that, in the event the user is not logged-in to Facebook, Meta can use to match with the user's actual Facebook ID, as shown below:

58.    If that same user then navigated to Emanate's "Doctor" page, selected a particular specialty (such as "OB/GYN"), and clicked on a specific doctor under that specialty, Pixel records that information and transmits it to Meta along with the cookies used to identify the user:

59.    As another example, the landing page for the Defendant's website prominently displays a search bar that asks, "What can we help you find?" If a user attempts to search for information about a specific condition by typing, for example, "depression," into the Website's search bar, the Defendant's Website displays the following page:



60.    Because the Defendant uses Pixel on its Website, the user's inquiry about a specific condition—in this case, "depression"—is transmitted to Meta along with the cookies used to identify the specific Facebook user:



61.    Defendant's use of Pixel on its Website also discloses to Meta a user's status as a patient or prospective patient.  For example, if the user navigates to the "Patient Health Portal" login/enroll page, the Website displays the following page:

62.    What the user would not know is that the Website's Source Code, where the Defendant intentionally embedded Pixel, commands the user's browser to relay to Meta that the user clicked on "Patient Health Portal" and accessed the webpage.  Nor would

the user know that Facebook could link this activity to the user's Facebook ID using the "c_user" and/or the "_fbp" cookies:



63.     Thus, by deploying Pixel on its Website, the Defendant allows Meta to learn about and record information concerning its patients' and prospective patients' Sensitive Information, including symptoms/conditions, treatments, physicians, and patient status. Pixel also transmits to Meta the necessary identifiers through cookies and IP addresses that Meta can use to link the user to a specific Facebook ID.

64.     Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to Meta.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures.  Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information.

**D.     Session Replay Code**

65.     Session Replay Code, such as that implemented on Defendant's Website, enables website operators to record, save, and replay website visitors' interactions with a

CLASS ACTION COMPLAINT

given website. The clandestinely deployed code provides online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[18]

66.    Session Replay Code goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[19] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[20]

67.    Session Replay Code works by inserting computer code into the various event-handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

68.    The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window

---

[18]    Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.
[19]    *Id.*
[20]    Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

CLASS ACTION COMPLAINT

resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. In order to permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

69.    Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

70.    Once the events from a user session have been recorded by a Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[21]

71.    Because most Session Replay Codes will by default indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[22]

72.    Most alarming, Session Replay Code may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-

---

[21] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

[22] *Id.*

receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

73.    Session Replay Code does not necessarily anonymize user sessions, either.

74.    First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

75.    Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

76.    Third, some Session Replay Providers explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[23]

77.    Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

78.    When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

79.    In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay

---

[23]    *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Aug. 29, 2023).

Code also exposes website visitors to identity theft, online scams, and other privacy threats.[24] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [ ] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[25]

80.    The privacy concerns arising from Session Replay Code are not theoretical or imagined. The CEO and founder of LOKKER, a provider of data privacy and compliance solutions has said "[consumers] should be concerned" about the use of Session Replay Code because "they won't know these tools are operating 'behind the scenes' of their site visit" and "even if the company disclosed that they are using these tools, consumers wouldn't likely be able to opt-out and still use the site."[26] True to this statement, Defendant's Website offers no opportunity to opt-out of its use of Session Replay Code, including if a user utilizes a private browsing mode on their browser.

81.    Indeed, the news is replete with examples of the dangers of Session Replay Code. For example, in 2019, the App Analyst, a mobile expert who writes about his analyses of popular apps, found that Air Canada's iPhone app wasn't properly masking the session replays they were sent, exposing unencrypted credit card data and password information.[27] This discovery was made just weeks after Air Canada said its app had a data breach, exposing 20,000 profiles.[28]

82.    Further, multiple companies have removed Session Replay Code from their websites after it was discovered the Session Replay Code captured highly sensitive

---

[24]    Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

[25]    Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

[26]    Mark Huffner, *Is 'session replay software' a privacy threat or just improving your web experience*, Consumer Affairs (Oct. 25, 2022), https://www.consumeraffairs.com/news/is-session-replay-software-a-privacy-threat-or-just-improving-your-web-experience-102522.html.

[27]    Zach Whittaker, *Many Popular iPhone Apps Secretly Record Your Screen Without Asking*, TechCrunch (Feb. 6, 2019), https://techcrunch.com/2019/02/06/iphone-session-replay-screenshots/.

[28]    *Id.*

information. For instance, in 2017, Walgreens stopped sharing data with a Session Replay Provider after it was discovered that the Session Replay Provider gained access to website visitors' sensitive information.[29] Indeed, despite Walgreens' extensive use of manual redactions for displayed and inputted data, the Session Replay Provider still gained access to full names of website visitors, their medical conditions, and their prescriptions.[30]

83.    Following the Walgreens incident, Bonobos, a men's clothing retailer, announced that it was eliminating data sharing with a Session Replay Provider after it was discovered that the Session Replay Provider captured credit card details, including the cardholder's name and billing address, and the card's number, expiration, and security code from the Bonobos' website.[31]

84.    Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[32] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[33]

85.    Despite the serious privacy concerns associated with Session Replay Code—even for commercial businesses selling consumer products—Emanate deployed Session Replay Code on its Website where patients and prospective patients search for doctors, inquire about medical conditions, and navigate to the online patient portal.

86.    On information and belief, Defendant deployed Session Replay Code from

---

[29]    Nitasha Tiku, *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, WIRED (Nov. 16, 2017), https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/.

[30]    Englehardt, *supra* note 18.

[31]    Tiku, *supra* note 26.

[32]    Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.

[33]    *Id.*

CLASS ACTION COMPLAINT

Session Replay Providers that include but are not limited to Crazy Egg., Inc.  According to Crazy Egg's website, its Session Replay Code allows website operators, like Defendant, to watch their user's web activities as if they "were standing right beside them":

> In the old days you had to invite people to your office and watch them use your site. We all know that forced experience didn't provide an accurate picture of how your real visitors were using your site. Those days are gone thankfully! With Crazy Egg Recordings, you can watch your users click, scroll, and navigate just as if you were standing right beside them. The added benefit is you're not breathing down their necks.[34]

87.    Defendant's use of the Crazy Egg Session Replay Code on its Website is reflected below:



88.    Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to Session Replay Providers like Crazy Egg.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures.  Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information.

---

[34]    https://www.crazyegg.com/recordings (last visited Aug. 29, 2023)

CLASS ACTION COMPLAINT

### E.    Visitor Web Tracking

89.    Defendant also implements a tracking technology that records all webpages users visited on the Website in order to link the users' webpage activity with a users' subsequent phone calls to Defendant. On information and belief, this web tracking technology is provided by third parties, including but not limited to a company called CallRail, Inc.  The purpose of the CallRail tracking code is to gain insights into user activity in the lead-up to phone calls with the Defendant, so the Defendant better understands what drives phone contacts.  CallRail's services allow companies like Defendant to "track every visitor to [its] website, regardless of their marketing source."[35]

90.    The information available with CallRail's visitor tracking includes, "Source Type (Google PPC, Google Organic, referrals from yelp.com, etc.); Keywords (for all PPC, including Bing & Yahoo calls); Landing page; Complete page view history of the caller; Referring domain; Medium; Tracking number called; Date and time of the call; Caller ID; City; Duration of the call; and Device type."[36]

91.    As with the other tracking technologies used by Defendant, the CallRail tracking code resulted in the unauthorized disclosure of Sensitive Information related to patients' interactions with Defendant's Website, including "complete page view history" that would include research regarding specific symptoms/conditions or searches for particular physicians, among other sensitive information.

92.    Defendant's use of the CallRail tracking code on its Website is reflected below:

---

[35]    https://support.callrail.com/hc/en-us/articles/5712712532109-Visitor-tracking-basics (last visited Aug. 29, 2023)

[36]    *Id.*

93.     Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to CallRail.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures.  Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information.

**F.    Exposure of Sensitive Information Creates a Substantial Risk of Harm**

94.     The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency.  In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency."[37]

95.     The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.  According to the FTC, reasonable data security protocols require, among other things: (1) using industry tested and accepted methods; (2) monitoring activity on networks to uncover unapproved activity; (3) verifying that privacy and security features

---

[37]     Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited Aug. 29, 2023) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

CLASS ACTION COMPLAINT

function properly; and (4) testing for common vulnerabilities or unauthorized disclosures.[38]

96.    The FTC cautions businesses that failure to protect Sensitive Information and the resulting privacy breaches can destroy consumers' finances, credit history, and reputations, and can take time, money and patience to resolve the effect.[39]  Indeed, the FTC treats the failure to implement reasonable and adequate data security measures as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

**G.    Plaintiffs' and the Class's Sensitive Information is Valuable**

97.    The personal and health information of Plaintiffs and the Class is valuable and has become a highly desirable commodity.  Indeed, one of the world's most valuable resources is the exchange of personal data.[40]

98.    Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[41]  Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[42]

99.    The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success.  Research

---

[38]    *Start With Security, A Guide for Business,* FTC (last visited Aug. 29, 2023) https://www.ftc.gov/business-guidance/resources/start-security-guide-business

[39]    *See* Taking Charge, What to Do if Your Identity is Stolen, FTC, at 3 (2012) (last visited Aug. 29, 2023), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf

[40]    *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[41]    Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 5, 2022; updated Aug. 25, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[42]    *Id.*

CLASS ACTION COMPLAINT

shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[43]

100.    In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[44]  In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[45]

101.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record.  A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[46]

102.    Unlike financial information, such as credit card and bank account numbers, PHI and certain PII cannot be easily changed.  Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life.  Medical histories are inflexible.  For these reasons, these types of information are the most lucrative and valuable.[47]

103.    Consumers place a considerable value on their Sensitive Information and the privacy of that information.  One 2002 study determined that U.S. consumers highly

---

[43]    Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[44]    Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220, OECD PUBLISHING PARIS, (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[45]    *Id.* at 25.

[46]    *Id.*

[47]    *Calculating the Value of a Privacy Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters, https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited Aug. 29, 2023).

CLASS ACTION COMPLAINT

value a website's protection against improper access to their Sensitive Information, between $11.33 and $16.58 per website. The study further concluded that to U.S. consumers, the collective "protection against error, improper access, and secondary use of personal information is worth between $30.49 and $44.62.[48] This data is approximately twenty years old, and the dollar amounts and values would likely be exponentially higher today.

104. Defendant's privacy violations exposed a variety of Sensitive Information, including medical conditions, symptoms, treatments sought, physicians, search queries, patient status, and other highly sensitive data.

105. Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[49] "Rapid digitization of health records … have positioned hospitals as a primary arbiter of how much sensitive data is shared."[50]

**H. Plaintiffs and the Class Had a Reasonable Expectation of Privacy in Their Interaction with Defendant's Website**

106. Consumers are concerned about companies, like Defendant, collecting their data and assume the data they provide, particularly highly sensitive medical data, will be kept secure and private.

107. In a recent survey related to internet user expectations, most website visitors stated they assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[51] As such, website

---

[48]    11-Horn Hann, Kai-Lung Hui, *et al*, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17. Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Aug. 29, 2023).

[49]    Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records*, The Wall Street Journal, (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200.

[50]    *Id.*

[51]    *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

CLASS ACTION COMPLAINT

visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[52]

108.   The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its' customers' data.[53] A March 2000 BusinessWeek/Harris Poll found that 89% of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[54]  The same poll found that 63% of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[55]  A July 2000 USA Weekend Poll showed that 65% of respondents thought that tracking computer use was an invasion of privacy.[56]

109.   Patients and website users act consistently with their expectation of privacy. For example, following a new rollout of iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[57]

110.   Like the greater population, certainly, Defendant's patients would expect the highly sensitive *medical* information they provided to Defendant through its Website to be kept secure and private.

### I.   Defendant's Conduct Violated HIPAA

111.   Under HIPAA, individuals' health information must be:

> properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being.  The Privacy Rule strikes a balance that permits

---

[52]   Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, THE INFORMATION SOCIETY, 38:4, 257, 258 (2022).

[53]   *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/.

[54]   *Id.*

[55]   *Id.*

[56]   *Id.*

[57]   Margaret Taylor, *How Apple screwed Facebook*, WIRED, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

CLASS ACTION COMPLAINT

important uses of information while protecting the privacy of people who seek care and healing.[58]

112.    HIPAA is a "federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge."[59]    The rule requires appropriate administrative, physical, and technological safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.[60]

113.    The Privacy Rule protects from unauthorized disclosure all "individually identifiable health information" held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral.  The Privacy Rule calls this information "protected health information (PHI)."  "Individually identifiable health information" is information, (1) that relates to: the individual's past, present or future physical or mental health or condition; the provision of health care to the individual; or the past, present, or future payment for the provision of health care to the individual; and (2) that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual.[61]

114.    The U.S. Department of Health and Human Services, Office for Civil Rights ("OCR") issued guidance in December 2022 warning about violations of the Privacy Rule based on the use of tracking technologies on health-care providers' websites.  According to the OCR guidance, "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology

---

[58]    U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule (last visited Aug. 29, 2023), https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

[59]    *Health Insurance Portability and Accountability Act of 1996 (HIPAA),* Centers for Disease Control and Prevention (last visited Aug. 29, 2023) https://www.cdc.gov/phlp/publications/topic/hipaa.html#:~:text=Health%20Insurance%20Portability%20and%20Accountability%20Act%20of%201996%20(HIPAA),-On%20This%20Page&text=The%20Health%20Insurance%20Portability%20and,the%20patient's%20consent%20or%20knowledge.

[60]    U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

[61]    *Id.*

CLASS ACTION COMPLAINT

vendors or any other violations of the HIPAA Rules."[62]  This includes "disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations."[63]

115.   OCR specifically warned about the dangers of disclosing PHI through a website's "unauthenticated webpage," or the portion of the site that does "not require users to log in before they are able to access the webpage."[64]  According to the OCR guidance, "in some cases, tracking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors."[65] Examples include, "[t]racking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials," and that are tied to individual identifiers, such as "an individual's email address and/or IP address."[66]

116.   Finally, the OCR guidance explained that data that could be used to identify individuals—such as IP addresses—qualified as PHI even if the person did not have an existing relationship with the health care provider.  According to the OCR guidance, information gathered through tracking technologies on healthcare websites,

> might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic

---

[62]    *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (last visited Aug. 29, 2023) https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html#ftnref29

[63]    *Id.*

[64]    *Id.*

[65]    *Id.*

[66]    *Id.*; *see* also 45 C.F.R. § 164.514 (2) (defining personally identifiable information to include "any unique identifying number, characteristic or code" and specifically listing the example of IP addresses).

location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[67]

117.    Through its use of tracking technologies on its Website to record and transmit Sensitive Information about its patients and prospective patients—along with identifiers (such as IP addresses and cookies) that third-party technology companies could use to identify individuals—Defendant violated HIPAA.

**J.    Plaintiffs' Experience**

*Plaintiff Valdez*

118.    As a condition of receiving Defendant's services, Plaintiff Valdez communicated his Sensitive Information to Defendant, on Defendant's Website, on numerous occasions, and most recently in August 2023.

119.    Plaintiff Valdez accessed Defendant's Website on his phone, a personal device, in connection with healthcare services he received from Defendant.

120.    Plaintiff Valdez researched his symptoms/conditions, doctors, and medical records on the Website.  He also used the patient portal on the Defendant's Website to review his test results and messages from his doctors.

121.    Plaintiff Valdez stayed logged-in to his Facebook account when browsing the internet, including when visiting Defendant's Website.

122.    Plaintiff Valdez reasonably expected that his communications with Defendant via the Website were confidential, solely between himself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

123.    As a result of the tracking technologies Defendant chose to install on its Website, Plaintiff Valdez's Sensitive Information was intercepted, viewed, analyzed, and used by unauthorized third parties. Defendant also used Plaintiff Valdez's Sensitive Information for commercial gain after it was unlawfully intercepted by Meta and other

---

[67]    *Id.*

CLASS ACTION COMPLAINT

1 | third parties related to the tracking technologies on Defendant's Website.

2 | 124. Plaintiff Valdez never consented to the disclosure of or use of his Sensitive
3 | Information by third parties or to Defendant enabling third parties to access or interpret
4 | such information.

5 | 125. By embedding Pixel and subsequently disclosing his Sensitive Information
6 | to third parties without his consent, Defendant breached Plaintiff Valdez's privacy and
7 | unlawfully disclosed his Sensitive Information.

8 | 126. Plaintiff Valdez has a continuing interest in ensuring that Sensitive
9 | Information, which, upon information and belief, remains backed up in Defendant's
10 | possession, is protected and safeguarded from future unauthorized disclosure(s).

11 | ***Plaintiff Lewis***

12 | 127. As a condition of receiving Defendant's services, Plaintiff Lewis
13 | communicated his Sensitive Information to Defendant, on Defendant's Website, on
14 | numerous occasions, and most recently in August 2023.

15 | 128. Plaintiff Lewis accessed Defendant's Website on his phone, a personal
16 | device, in connection with healthcare services he received from Defendant.

17 | 129. Plaintiff Lewis visited the Defendant's Website to search for his doctors,
18 | symptoms/conditions, and insurance information. He also used the patient portal on the
19 | Defendant's Website.

20 | 130. Plaintiff Lewis stayed logged-in to his Facebook account when browsing the
21 | internet, including when visiting Defendant's Website.

22 | 131. Plaintiff Lewis reasonably expected that his communications with
23 | Defendant via the Website were confidential, solely between himself and Defendant, and
24 | that such communications would not be transmitted to or intercepted by a third party.

25 | 132. As a result of the tracking technologies Defendant chose to install on its
26 | Website, Plaintiff Lewis's Sensitive Information was intercepted, viewed, analyzed, and
27 | used by unauthorized third parties. Defendant also used Plaintiff Lewis' Sensitive
28 | Information for commercial gain after it was unlawfully intercepted by Meta and other

37

third parties related to the tracking technologies on Defendant's Website.

133.  Plaintiff Lewis never consented to the disclosure of or use of his Sensitive Information by third parties or to Defendant enabling third parties to access or interpret such information.

134.  By making these disclosures without his consent, Defendant breached Plaintiff Lewis's privacy and unlawfully disclosed his Sensitive Information.

135.  Plaintiff Lewis has a continuing interest in ensuring that Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

***Plaintiff Diamond***

136.  As a condition of receiving Defendant's services, Plaintiff Diamond disclosed her Sensitive Information to Defendant, on Defendant's Website, on numerous occasions within the last year.

137.  Plaintiff Diamond accessed Defendant's Website on her phone, a personal device, in connection with healthcare services she received from Defendant.

138.  Plaintiff Diamond visited the Defendant's Website to search for her test results, symptoms/conditions, doctors, and billing information.  She also used the patient portal on the Defendant's Website.

139.  Plaintiff Diamond reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

140.  As a result of the tracking technologies Defendant chose to install on its Website, Plaintiff Diamond's Sensitive Information was intercepted, viewed, analyzed, and used by unauthorized third parties. Defendant also used Plaintiff Diamond's Sensitive Information for commercial gain after it was unlawfully intercepted by Meta and other third parties related to the tracking technologies on Defendant's Website.

141.  Plaintiff Diamond never consented to the disclosure of or use of her Sensitive Information by third parties or to Defendant enabling third parties to access or

interpret such information.

142.   By making these disclosures without her consent, Defendant breached Plaintiff Diamond's privacy and unlawfully disclosed her Sensitive Information.

143.   Plaintiff Diamond has a continuing interest in ensuring that Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

## CLASS PERIOD

144.   For purposes of this Class Action Complaint, the Class Period corresponds to the period between September 2019 and the present and runs until such date as the Court enters an Order certifying any Count of this Class Action Complaint for class action treatment.

## CLASS ALLEGATIONS

145.   Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated, as representatives of the following Class:

> All persons in California whose Sensitive Information was disclosed to a third party through Defendant's Website without authorization or consent during the Class Period.

146.   Excluded from the Class are Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees.  Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

147.   Plaintiffs reserve the right to modify and/or amend the Class definition, including but not limited to creating subclasses, as necessary.

148.   All members of the proposed Class are readily identifiable through Defendant's records.

149.   All requirements for class certification under Fed.R.Civ.P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

150. **Numerosity.** The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiffs are informed and believe that the proposed Class includes a population of residents of approximately one million people. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

151. **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiffs and Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

   a. Whether Plaintiffs' and Class Members' communications with Defendant's Website were unlawfully intercepted and disclosed to third parties;

   b. Whether Defendant owed Plaintiffs and the other Class Members a duty to adequately protect their Sensitive Information;

   c. Whether Defendant owed Plaintiffs and the other Class Members a duty to secure their Sensitive Information from disclosure via third-party tracking technologies;

   d. Whether Defendant owed Plaintiffs and the other Class Members a duty to implement reasonable data privacy protection measures because Defendant accepted, stored, created, and maintained highly sensitive information concerning Plaintiffs and the Class;

   e. Whether Defendant knew or should have known of the risk of disclosure of data through third-party tracking technologies;

   f. Whether Defendant breached its duty to protect the Sensitive Information of Plaintiffs and other Class Members;

   g. Whether Defendant knew or should have known about the inadequacies of its privacy protection;

h.  Whether Defendant failed to use reasonable care and reasonable methods to safeguard and protect Plaintiffs' and the Class's Sensitive Information from unauthorized disclosure;

i.  Whether proper data security measures, policies, procedures and protocols were enacted within Defendant's computer systems to safeguard and protect Plaintiffs' and the Class's Sensitive Information from unauthorized disclosure;

j.  Whether Defendant's conduct was the proximate cause of Plaintiffs' and the Class's injuries;

k.  Whether Plaintiffs and the Class had a reasonable expectation of privacy in their Sensitive Information;

l.  Whether Plaintiffs and the Class suffered ascertainable and cognizable injuries as a result of Defendants' misconduct;

m.  Whether Plaintiffs and the Class are entitled to recover damages; and

n.  Whether Plaintiffs and the Class are entitled to other appropriate remedies including injunctive relief.

152.  Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Class. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

153.  **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class member, was improperly disclosed by Defendant. Defendant's misconduct impacted all Class Members in a similar manner.

154.  **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class and have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

155.  **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual patients like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

156.  Class Certification under Fed.R.Civ.P. 23(b)(2) is also appropriate. Defendant has acted or refused to act on grounds that apply generally to the Class, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiffs and the Class remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with dealings and contracts similar to Plaintiffs', even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual patients, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to individual patients which would, as a practical matter, be dispositive of the interests of the other patients not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Class. Further, the claims of individual patients in the defined Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

# CLAIMS

## COUNT I

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA") Cal. Penal Code § 630, *et seq*.

157.    Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

158.    The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

159.    CIPA begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Pen. Code § 630.

160.    California Penal Code § 631(a) imposes liability on:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and ***without the consent of all parties to the communication***, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . .

161.    At all relevant times, Defendant has been a "person" within the scope of CIPA. Cal. Penal Code §631(a).

162.    Defendant aided, employed, agreed with, and conspired with Meta and other third-party technology companies to track and intercept Plaintiffs' and the Class Members' internet communications while using Defendant's Website. Defendant's conduct allowed unauthorized third parties to read and learn about the contents or

meaning of any message, report, or communication from Plaintiffs and Class Members while the same was in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California.

163. Defendant intentionally inserted an electronic device (the tracking technology code) that, without the knowledge and consent of Plaintiffs and Class Members, recorded and transmitted their confidential communications with Defendant to third parties.

164. Defendant willfully facilitated and aided the interception and collection of Plaintiffs' and Class Members' Sensitive Information by embedding the tracking technology code on the Website.

165. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the tracking technology code falls under the broad catch-all category of "any other manner":

    a.   The computer codes and programs Meta, Crazy Egg, and CallRail used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

    b.   Plaintiffs' and Class Members' browsers;

    c.   Defendant's Website and webserver;

    d.   Plaintiffs' and Class Members' computing and mobile devices;

    e.   The web and ad servers from which Meta, Crazy Egg, and CallRail tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate the Website;

    f.   The computer codes and programs used by Meta, Crazy Egg, and CallRail to effectuate its tracking and interception of Plaintiffs' and Class Members' communications while they were using a browser to visit the Website; and

    g.   The plan Defendant, Meta, Crazy Egg, and CallRail carried out to effectuate their tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to visit the Website.

166. As a result of the above violations and pursuant to CIPA Section 637.2,

Defendant is liable to Plaintiffs and Class Members for the greater of: a) treble actual damages related to their loss of privacy in an amount to be determined at trial; or b) for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

167.   Under the statute, Defendant is also liable for reasonable attorneys' fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

168.   Based on the foregoing, Plaintiffs and Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## <u>COUNT II</u>

## VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA") 18 U.S.C. § 2511(1), et seq.

169.   Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

170.   The ECPA protects both the sending and receipt of communications.

171.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of ECPA.

172.   The transmissions of Plaintiffs' PII and PHI to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

173.   <u>Electronic Communications</u>. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Website are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects

interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

174.   <u>Content.</u> The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

175.   <u>Interception.</u> The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

176.   <u>Electronical, Mechanical, or Other Device.</u> The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

177.   The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

     a.  Plaintiffs' and Class Members' browsers;

     b.  Plaintiffs' and Class Members' computing devices;

     c.  Defendant's web-servers; and,

     d.  The tracking technology code deployed by Defendant to effectuate sending and acquiring patient communications.

178.   By utilizing and embedding the tracking technology code on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

179.   Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the tracking technology, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Sensitive Information to third parties.

180.   Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI.

181.   By intentionally disclosing or endeavoring to disclose Plaintiffs' and Class Members' electronic communications to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

182.   By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

183.   <u>Unauthorized Purpose.</u> Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing tortious and criminal acts in violation of the Constitution or laws of the United States or of any State.   Indeed, Defendant's primary purpose for deploying the tracking technologies was to secretly and deceptively, without permission, collect data from users in violation of their privacy rights.

184.   By embedding the tracking technologies on its Websites and disclosing the content of patient communications relating to medical research, patient portals, doctors, and other sensitive information, Emanate had a purpose that was tortious, criminal, and designed to violate state and federal laws including:

a.  Violations of the right to privacy;

b.  Violations of unfair competition law;

c.  Violations of 42 U.S.C. § 1320d-6, the Administrative Simplification subtitle of HIPAA, which protects against the disclosure of individually identifiable health information to another person and is a criminal offense punishable by fine or imprisonment; and

d.  Violations of HIPAA.

185. Embedding the Pixel and other tracking technologies on Defendant's Website may have also violated state computer crime laws, which generally prohibit unauthorized access to computer data, systems, and networks. *See generally* California, Cal. Penal Code § 502.

186. 42 U.S.C. § 1320d-6 provides criminal and civil penalties against a healthcare provider who "knowingly . . . discloses individually identifiable health information to another person." Section 1320d(6) HIPAA defines individually identifiable health information (IIHI) as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

187. Guidance issued by the Department of Health and Human Services confirms that the type of online tracking technologies deployed by Defendant violate HIPAA. HIPAA prohibits disclosing patients' health information via tracking technologies on both user-authenticated webpages (such as the patient portal) and unauthenticated webpages. The guidance includes IP addresses, device IDs, and unique identifying codes collected on a regulated entity's website in the definition of IIHI. As described above, Plaintiffs entered data on Defendant's website relating to their private medical issues and later received advertisements. This shows that through the tracking technologies employed, Defendant disclosed its patients' individually identifiable health information to third parties in violation of the ECPA, and the criminal or tortious purpose exception in § 2511(2)(d) does not relieve Defendant of liability.

188. Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communications.

189.   Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the tracking technology code.

190.   A person who violates § 2511(1) is liable for $10,000 in statutory damages to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used.

191.   Defendant is liable to Plaintiffs and Class Members for violations of the ECPA.

192.   Based on the foregoing, Plaintiffs and Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## COUNT III

## VIOLATION OF THE CONFIDENTIALITY OF MEDICAL INFORMATION ACT

### ("CMIA") Cal. Civ. Code §§ 56, *et seq.*

193.   Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

194.   The California Confidentiality of Medical Information Act, California Civil Code §§ 56, et seq. ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without patient authorization.

195.   "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual[.]" Cal. Civ. Code § 56.05.

CLASS ACTION COMPLAINT

196.   The CMIA applies to Defendant.  Defendant is a business under Cal. Civil Code § 56.06 and is therefore subject to the requirements of the CMIA, including but not limited to §§56.10 and 56.101.

197.   Defendant is a "provider of health care" as defined by California Civil Code § 56.06(b).

198.   Plaintiff and Class Members are patients, and, as a health care provider, Defendant has an ongoing obligation to comply with the CMIA's requirements.

199.   Cal. Civil Code § 56.10 states, in pertinent part, that "[n]o provider of health care . . . shall disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization . . . ." Section 56.101 of the CMIA states, in pertinent part, that "[a]ny provider of health care . . . or contractor . . .  who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties . . ."  Cal. Civ. Code §§ 56.10, 56.101.  Through the conduct described herein, Defendant violated the CMIA, including these sections.

200.   As set forth above, device identifiers, web URLs, Internet Protocol (IP) addresses and other characteristics that can uniquely identify Plaintiffs and Class Members are transmitted to third parties in combination with patient medical conditions, medical concerns, treatment(s) sought by the patients, physicians search for, and other medical information. This is protected health information under the CMIA.

201.   This private medical information is intercepted and transmitted to third parties via Defendant's use of the tracking technologies on its Website. Because the medical information is disclosed in combination with unique identifiers that the third parties can use to identify the particular patient (such as the Facebook ID), the disclosure pertains to a "patient" and violates the CMIA.

202.   Upon information and belief, the private medical information of Plaintiffs and Class Members that was improperly intercepted and transmitted to third parties via Defendant's use of the tracking technologies was subsequently improperly viewed,

1 accessed, acted upon and otherwise used by the third parties to, among other things, tailor

2 advertisements to them and/or provide analytics services to Defendant.

3    203.   The information described above constitutes medical information pursuant

4 to the CMIA because it is patient information derived from a provider of health care

5 regarding patients' medical treatment and physical condition, and this medical

6 information is linked with individually identifying information. See Cal. Civ. Code §

7 56.05(i).

8    204.   Defendant did not obtain Plaintiffs' and the Class Members' authorization

9 for the disclosure of medical information and failed to disclose in its Privacy Policy that

10 it shares protected health information with third parties for marketing purposes.

11    205.   Pursuant to CMIA Section 56.11, a valid authorization for disclosure of

12 medical information must be:

> (1) Clearly separate from any other language present on the same page and is
> executed by a signature which serves no other purpose than to execute the
> authorization;
> (2) signed and dated by the patient or her representative;
> (3) state the name and function of the third party that receives the information; and
> (4) state a specific date after which the authorization expires.

17 CMIA Section 56.11. Further, the Website Notice of Privacy Practices does not require

18 consumers to agree to them by selecting or clicking a "checkbox" presented in a

19 sufficiently conspicuous manner to put Plaintiffs on notice of them.  Accordingly, even

20 if the Defendant's Website disclosed its use of tracking technologies for marketing

21 purposes (which it does not), the information set forth in Defendant's Website Privacy

22 Notice does not qualify as a valid authorization.

23    206.   As described above, Defendant is intentionally violating the CMIA by

24 choosing to install the tracking technologies on its Website and disclosing its patients'

25 medical information to third parties along with the patients' individually identifying

26 information. Accordingly, Plaintiff and Class Members seek all relief available for

27 Defendant's CMIA violations.

28

207.   Based on the foregoing, Plaintiff and Class Members seek nominal damages, compensatory damages, punitive damages, attorneys' fees and costs of litigation for Defendant's violation(s) of the CMIA.

## COUNT IV

### INVASION OF PRIVACY – INTRUSION UPON SECLUSION

208.   Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

209.   A claim for intrusion upon seclusion requires (1) intrusion into a private place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy; (2) in a manner highly offensive to a reasonable person.

210.   By intentionally embedding and implementing the tracking technologies on its Website, Defendant intruded upon and permitted unauthorized third parties to intrude upon Plaintiffs' and the Class's private communications with Defendant regarding sensitive medical information.

211.   Plaintiffs and the Class have an objective, reasonable expectation of privacy in their communications with Defendant via the Website, particularly those containing sensitive medical information.

212.   Plaintiffs and the Class Members did not consent to, authorize, or know about Defendant's intrusion of their privacy at the time it occurred.  Plaintiffs and the Class Members never agreed that Defendant could install a recording device (Pixel or other tracking technologies) to actively record their Website sessions in real-time or disclose their Sensitive Information to its vendors and other third parties.

213.   Defendant's use of the tracking technologies to record and disclose Plaintiffs' and the Class's Sensitive Information obtained via the Website is highly offensive to a reasonable person because Plaintiffs' and the Class Members did not know they were being recorded and tracked, and the disclosures relate to patients' and prospective patients' most sensitive personal information, including information about specific symptoms/conditions and treatments sought.  The disclosure is also highly

offensive because it violates HIPAA mandates, industry standards, and Defendant's own Privacy Policy.

214.   By implementing the tracking technologies on its Website, Defendant intentionally intruded on Plaintiff's and the Class's private life, seclusion, or solitude, without consent.   This conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

215.   As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class's private data, Plaintiffs and Class Members suffered and continue to suffer harm and injury.   Given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class Members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiffs' and Class Members' property.

216.   Further, Defendant has improperly profited from its invasion of Plaintiffs' and the Class Members' privacy in its use of their data for its economic value.

217.   Plaintiffs and the Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

218.   To the extent Defendant's conduct is ongoing, and it continues to unlawfully disclose the communications of Plaintiffs and the Class Members any time they use or provide information to Defendant through its Website without their consent, Plaintiffs and the Class Members are entitled to declaratory and injunctive relief.   This will prevent future unlawful and unauthorized disclosure of Plaintiffs' and the Class Members' Sensitive Information.

## <u>COUNT V</u>

## **CALIFORNIA CONSTITUTION INVASION OF PRIVACY**

219.   Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

220.   Article I, section 1 of the California Constitution provides:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

Cal. Const. art. I, § 1.

221.  A claim for invasion of privacy under the California Constitution requires Plaintiffs to show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is so serious as to constitute an egregious breach of the social norms such that the breach is highly offensive.

222.  By intentionally embedding and implementing the tracking technologies on its Website, Defendant invaded Plaintiffs' and Class Members' legally protected privacy interests in the confidentiality of their communications with Defendant regarding sensitive medical information.

223.  Plaintiffs and the Class have an objective, reasonable expectation of privacy in their communications with Defendant via the Website, particularly those containing sensitive medical information.

224.  Plaintiffs and the Class Members did not consent to, authorize, or know about Defendant's invasion of their privacy at the time it occurred.  Plaintiffs and the Class Members never agreed that Defendant could install a recording device (Pixel or other tracking technologies) to actively record their Website sessions in real-time or disclose their Sensitive Information to its vendors and other third parties.

225.  By implementing the tracking technologies on its Website, Defendant intentionally disclosed private facts about Plaintiffs' and Class Members' symptoms and conditions, searches for doctors and treatments, and status as patients or prospective patients.

226.  Defendant's use of the tracking technologies to record and disclose Plaintiffs' and the Class's Sensitive Information obtained via the Website is an egregious breach of social norms and highly offensive to a reasonable person because Plaintiffs'

CLASS ACTION COMPLAINT

and the Class Members did not know they were being recorded and tracked, and the disclosures relate to patients' and prospective patients' most sensitive personal information, including information about specific symptoms/conditions and treatments sought. The disclosure is also an egregious breach of social norms and highly offensive because it violates HIPAA mandates, industry standards, and Defendant's own Privacy Policy.

227. As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class's private data, Plaintiffs and Class Members suffered and continue to suffer harm and injury. Given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class Members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiffs' and Class Members' property.

228. Further, Defendant has improperly profited from its invasion of Plaintiffs' and the Class Members' privacy in its use of their data for its economic value.

229. Plaintiffs and the Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

## COUNT VI

### VIOLATION OF THE UNFAIR COMPETITION LAW

### ("UCL") Cal. Bus. & Prof. Code § 17200, *et seq.* – Unlawful Business Practices

230. Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

231. Plaintiffs, Class Members and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

232. The acts, omissions and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

233. California Business and Professions Code §§ 17201, et seq., prohibits acts of unfair competition, which includes unlawful business practices.

234.   Plaintiffs and Class Members bring their claims for injunctive relief as they have no confidence that Defendant has altered its privacy practices and they may wish to use Defendant's services in the future.

235.   Plaintiffs and Class Members bring their claims for restitution in the alternative to their claims for damages.

236.   Defendant engaged in unlawful business practices by disclosing Plaintiffs' and Class Members' Sensitive Information to unrelated third parties, including Meta, without prior consent in violation of the privacy statutes alleged herein.

237.   Defendant's unlawful acts and practices include violations of Plaintiffs' and Class Members' constitutional rights to privacy; Cal. Penal Code §§ 630, *et. seq.* ; Cal. Civ. Code §§ 56, *et. seq.*; and 18 U.S.C. § 2511(1), *et seq.*

238.   Plaintiffs request appropriate injunctive and declaratory relief against the continuation of the practices described and complained of herein.  Such relief will create a public benefit.  Plaintiffs separately seeks public injunctive relief on behalf of the general public of California who have yet to deal with Defendant in the manner described herein, but are likely to in the future, and therefore, are in need of protection provided by the public injunctive relief sought. Such public injunctive relief will create additional public benefits.

239.   As a direct result of Defendant's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property including, but not limited to, loss of the benefit of the bargain in using Defendant's services.  Specifically, Plaintiffs and the Class Members used Defendant's Website for health services and paid Defendant (directly or indirectly) for providing health services with the expectation that their Sensitive Information would remain confidential. Had Plaintiffs and Class Members known the truth that Defendant secretly disclosed their Sensitive Information to third parties, they would have used the services of another healthcare provider, paid or demanded a lower price for Defendant's services, or had the opportunity to seek consideration for the use of their Sensitive Information.

240.    The unauthorized access to Plaintiffs' and Class Members' private and personal data also diminished the value of that information by making it available for free to Meta and other third parties for their use in marketing and advertising and generating profits.

241.    As a direct result of its unlawful practices, Defendant has been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5) and injunctive or other equitable relief.

242.    Plaintiffs allege this claim in the alternative in the event Plaintiffs and Class Members have an inadequate remedy at law.

## <u>COUNT VII</u>

### BREACH OF IMPLIED CONTRACT

243.    Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

244.    When Plaintiffs and Class Members paid money and provided their Sensitive Information to Defendant in exchange for services, they entered implied contracts pursuant to which Defendant agreed to safeguard and not disclose their Sensitive Information without Plaintiffs' and Class Members' consent.

245.    An implicit part of the agreement was that Defendant would safeguard Plaintiffs' and Class Members' Sensitive Information consistent with industry and regulatory standards and Defendant's privacy policy and would timely notify Plaintiffs in the event of a disclosure to third parties.

246.    Plaintiffs and Class Members would not have entrusted Defendant with their Sensitive Information in the absence of an implied contract between them and Defendant obligating Defendant not to disclose this information without consent.

CLASS ACTION COMPLAINT

247.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

248.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Sensitive Information to various third parties, including Meta.

249.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's services, or would have paid substantially less for these services, had they known their sensitive health-related information would be disclosed.

250.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breaches of implied contract.

## COUNT VIII

### UNJUST ENRICHMENT

251.    Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

252.    Plaintiffs and Class Members provided their Sensitive Information to Defendant for the purposes of receiving healthcare services or healthcare related information and knowledge.  Defendant receives a benefit from its use of Plaintiffs' and the Class Members' Sensitive Information, including monetary compensation. Defendant intentionally collected and used Plaintiffs' and the Class Members' Sensitive Information for its own gain, without consent or authorization.

253.    Defendant unjustly retained those benefits at the expense of Plaintiffs and the Class Members and this conduct damaged Plaintiffs and the Class Members. Plaintiffs and the Class Members were not compensated by Defendant for the data they provided.

254.    It would be inequitable and unjust for Defendant to retain any of the profit or other benefits derived from the secret, unfair, and deceptive data tracking methods Defendant employs on its Website.

255.    The Court should require Defendant to disgorge all unlawful or inequitable proceeds that it received into a common fund for the benefit of Plaintiffs and Class Members, and order other such relief as the Court may deem just and proper.

256.    Plaintiffs allege this claim in the alternative in the event Plaintiffs and Class Members have an inadequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

a.    Certification the Class pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

b.    Designation of Plaintiffs as representatives of the Class and the undersigned counsel as Class Counsel;

c.    An award of damages in an amount to be determined at trial or by this Court;

d.    An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

e.    An order for declaratory relief as may be appropriate;

f.    An award of statutory interest and penalties;

g.    An award of costs and attorneys' fees; and

h.    Such other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.


Respectfully submitted,

ZIMMERMAN REED LLP

Dated: September 19, 2023         /s/ Y. Christopher Nagakawa
                                 Y. Christopher Nagakawa
                                 6420 Wilshire Blvd, Suite 1080
                                 Los Angeles, CA 90048
                                 Tel: (877) 500-8780
                                 Fax: (877) 500-8781
                                 Christopher.nagakawa@zimmreed.com

ZIMMERMAN REED LLP

Ryan J. Ellersick (*Pro Hac Vice* forthcoming)
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Tel: (480) 348-6400
Fax: (480) 348-6415
ryan.ellersick@zimmreed.com

ZIMMERMAN REED LLP

Jason P. Johnston (*Pro Hac Vice* forthcoming)
80 S 8th Street, 1100 IDS Center
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844
Jason.johnston@zimmreed.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT